## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
-----------------------------------X
CHARLES MILLER and ALAN FREBERG,    :
Derivatively and on behalf of       :
PerkinElmer, Inc, A Massachusetts   :      04 11599 GAO
Corporation,                        :
                                    :
            Plaintiffs,             :
                                    :   SHAREHOLDER DERIVATIVE
                                    :   COMPLAINT
      v.                            :
                                    :   MAGISTRATE JUDGE _____
GREGORY L. SUMME, ROBERT FRIEL,     :
NICHOLAS LOPARDO, GABRIEL           :
SCHMERGEL, KENTON SICCHITANO, and   :
TAMARA ERICKSON,                    :   JURY TRIAL DEMANDED
                                    :
            Defendants.             :
                                    :
         -and-                      :
                                    :   RECEIPT # 52385
                                    :   AMOUNT $ 150
PERKINELMER, INC., A Massachusetts  :   SUMMONS ISSUED yes
Corporation,                        :   LOCAL RULE 4.1 _____
                                    :   WAIVER FORM _____
            Nominal Defendant.      :   MCF ISSUED _____
                                    :   BY DPTY. CLK. _____
-----------------------------------X    DATE 7/16/04
```

Plaintiffs, by their undersigned attorneys, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, inter alia, the investigation made by and through their attorneys, which investigation included, inter alia, a review of the public documents and press releases of nominal defendant PerkinElmer, Inc. ("Perkin" or the "Company"), as follows:

**NATURE OF ACTION**

1. This is a shareholder's derivative action brought on behalf of Perkin, a Massachusetts corporation with headquarters and principal place of business in Wellesley, Massachusetts. Plaintiffs, on behalf of Perkin, allege that defendants, who are officers and/or directors of the Company, damaged Perkin by deliberately, in bad faith or recklessly: (i) implementing a sham system of internal controls completely inadequate to ensure proper recognition of revenue; (ii) causing the Company to issue false and misleading statements regarding the Company's earnings and revenues; (iii) exposing the Company to massive liability for securities fraud; (iv) damaging the Company's reputation; and (v) trading Perkin stock while in possession of material, non-public information concerning the true financial condition of the Company.

2. During the period July 15, 2001 through April 11, 2002 ("the Relevant Period"), defendants caused the Company to issue a series of false and misleading statements concerning the performance of the Company's products and its financial results. In particular, defendants caused the Company to announce that certain highly-touted digital cardiac flat panel X-Ray detectors produced by its Optoelectronics unit were commercially viable, when in fact they were not. Defendants then caused the Company improperly to recognize revenue on the

shipment of these products, while failing to ensure that the Company account for product return and warranty charges which eventually became necessary due to an extraordinary product failure and return rate, the high likelihood of which was known to defendants. The Audit Committee of the Board of Directors, which was responsible for overseeing the Company's accounting practices and financial reporting throughout the Relevant Period, failed to prevent these unlawful practices.

3. Defendants' actions and/or omissions constituted breaches of their fiduciary duties to the Company. By making Perkin appear more successful than it actually was, defendants maintained their positions as officers and/or directors of the Company and their continued lucrative employment with the Company. Defendants actions also enabled them to sell their personal holdings of Perkin common stock at an artificially inflated price and to increase the value of their substantial personal holdings of Perkin stock.

4. Defendants have harmed the Company by exposing it to massive liability in a consolidated securities class action pending in this Court ("the Class Action") by defrauded purchasers of Perkin stock. In an order dated September 30, 2003 denying the motion to dismiss the Class Action, this Court ruled that, based on many of the facts alleged below, plaintiffs in the Class Action stated claims for

3

securities fraud against the Company and certain of its executives. More specifically, this Court held, <u>inter alia</u>, that certain defendants' insider trading during the period when product return and accounting issues were becoming "increasingly apparent" to them, in addition to their motivation to falsify Perkin's financial condition so as to receive enormous incentive-based pay, gave rise to a strong inference of scienter, or fraudulent intent.

### JURISDICTION AND VENUE

5. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C.§ 1332.

6. Venue is proper because many of the acts and transactions alleged herein occurred in substantial part in this judicial district.

### PARTIES

7. Plaintiff Charles Miller held Perkin stock during the Relevant Period, and continues to hold Perkin stock. Plaintiff Miller is a citizen of New York.

8. Plaintiff Alan Freberg held Perkin stock during the Relevant Period, and continues to hold Perkin stock. Plaintiff Freberg is a citizen of New York.

9. Nominal Defendant Perkin is a Massachusetts corporation and maintains its executive offices at 45 William Street in Wellesley, Massachusetts. According to its public

4

filings, Perkin is a leading provider of scientific instruments, consumables and services to the pharmaceutical, biomedical, environmental testing and general industrial markets. Perkin designs, manufactures, markets and services products and systems within three businesses, each constituting one reporting segment: (1) Life and Analytical Sciences, which provides drug discovery, genetic screening, and environmental and chemical analysis tools, including instruments, reagents, consumables, and services; (2) Optoelectronics, which provides a range of digital imaging, sensor and specialty lighting components used in the biomedical, consumer products and other specialty end markets; and (3) Fluid Sciences, which provides fluid control and containment solutions for highly demanding environments such as turbine engines and semiconductor fabrication facilities. The Company's X-Ray panel products, as discussed in more detail herein, were part of the Digital Imaging segment in the Optoelectronics unit. The Optoelectronics segment accounted for 31% of the Company's revenues in 2001, while Digital Imaging accounted for 24% of Optoelectronics' revenue. Perkin common stock trades on the New York Stock Exchange.

10. Defendant Gregory L. Summe ("Summe") has been a director of the Company since 1998, and serves as Perkin's Chairman, Chief Executive Officer and President. He also chairs the Board's Executive Committee. For Fiscal Year

5

("FY") 2001, Summe received more than $4.8 million in salary and bonus, including a year-end bonus of over $2 million and forgiveness of an $875,000 loan. Summe also received in FY 2001 1.8 million options to purchase Perkin stock. Summe beneficially owns 2.3 million shares of Perkin stock. During the Relevant Period, Summe sold 300,000 shares of Perkin stock for proceeds exceeding $9 million while in possession of material, adverse, inside information concerning Perkin's financial condition. Summe is sometimes referred to herein as an "Insider Trading Defendant." Defendant Summe is a citizen of Massachusetts.

11. Defendant Robert Friel ("Friel") has been Senior Vice President and Chief Financial Officer of the Company since 1999. For FY 2001, Friel received more than $1 million in salary and bonus, in addition to options to purchase 700,000 shares of Perkin stock. Friel beneficially owns 637,000 stock of Perkin stock. During the Relevant Period, Friel sold 150,000 shares of Perkin stock for proceeds exceeding $4.9 million while in possession of material, adverse, inside information concerning Perkin's financial condition. Friel is sometimes referred to herein as an "Insider Trading Defendant." Defendant Friel is a citizen of Massachusetts.

12. Defendant Nicholas Lopardo ("Lopardo") has been a Director of the Company since 1996. Lopardo served on

6

the Audit Committee of the Board of Directors during FY 2001 and FY 2002 and served as its Chairman during FY 2001. Lopardo beneficially owns 68,966 stock of Perkin stock. Defendant Lopardo is a citizen of Massachusetts.

13. Defendant Gabriel Schmergel ("Schmergel") has been a Director of the Company since 1999. During FY 2001 and FY 2002, Schmergel served on the Audit Committee of the Board of Directors. Schmergel beneficially owns 31,816 stock of Perkin stock. Defendant Schmergel is a citizen of Massachusetts.

14 Defendant Kenton J. Sicchitano ("Sicchitano") has been a Director of the Company since 2001. During FY 2001 and FY 2002, Sicchitano served on the Audit Committee of the Board of Directors, and served as its Chairman during FY 2002. Sicchitano beneficially owns 26,249 stock of Perkin stock. Defendant Sicchitano is a citizen of Massachusetts.

15. Defendant Tamara Erickson ("Erickson") has been a Director of the Company since 1995. During FY 2001, Erickson served on the Audit Committee of the Board of Directors. Erickson beneficially owns 43,016 stock of Perkin stock. Defendant Erickson is a citizen of Massachusetts.

16. Defendants Summe, Lopardo, Schmergel, Sicchitano, and Erickson are sometimes collectively referred to herein as the "Director Defendants." During FY 2003, all of the

7

Director Defendants except Summe received as compensation for their Board membership $30,000 in cash, an award of 4,228 stock of Perkin common stock worth $40,000, and options to purchase 7,893 stock of Perkin common stock. Defendants Lopardo, Schmergel and Sicchitano received an additional $10,000 as chairmen of various committees of the Board, as well as additional options to purchase stock of Perkin stock.

17. The Director Defendants and the Insider Trading Defendants are sometimes collectively referred to as "the Individual Defendants."

18. Each of the Individual Defendants, by virtue of his or her management and/or directorship positions, had the duty to exercise due care and diligence in carrying out their responsibilities, in connection with the management of the Company, and had the duty of full and candid disclosure of all material facts related thereto. The Individual Defendants likewise had a duty of loyalty to the Company to act in the best interests of the Company and its shareholders.

19. To fulfill such duties, the Individual Defendants were required to exercise reasonable care and prudent supervision of the Company, including assuring the dissemination of truthful information concerning the business, operations, and financial reporting of Perkin. More specifically, the Individual Defendants were required to supervise the preparation

8

of Perkin's SEC filings and approve any reports concerning the Company's financial condition and results of operations, including the assurance the Company's compliance with Generally Accepted Accounting Principles ("GAAP").

20. As a consequence of the Individual Defendants' positions with Perkin, each knew and had access to non-public information about the business of Perkin, including its finances, markets, and present and future business prospects. This knowledge stemmed from the Individual Defendants' access to internal corporate documents (including Perkin's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors' meetings and committees thereof, and reports and other information provided to them in connection therewith.

21. The Individual Defendants, as corporate fiduciaries, were obligated either to disclose any material, adverse, non-public information regarding Perkin or to abstain from trading on such information.

**SUBSTANTIVE ALLEGATIONS**

22. On July 15, 2001, defendants caused the Company to announce "record" income for the second quarter of FY

2001, the 15th consecutive quarter of "double digit" income growth, and that earnings had exceeded consensus estimates:

- EPS $0.38 from Continuing Operations
- Operating Margin Expands 300 basis points
- 12% Organic Growth in Life Sciences

PerkinElmer, Inc., (NYSE:PKI) today reported second quarter net income from continuing operations of $39 million, up 34% over the second quarter of last year. Second quarter cash earnings per share were $0.38, a 31% increase over the same period in 2000.

"Aggressive actions starting earlier in the year are allowing us to deliver our financial commitments in spite of this difficult economic environment," said Gregory L. Summe, Chairman and Chief Executive Officer.

Revenue for the quarter grew 6% to $391 million on a reported basis. <u>Strong growth in Life Sciences, Digital Imaging, Aerospace and Analytical Instruments offset sharp declines in sales to Semiconductor and Photography markets.</u> The Company announced its intention to sell its Security and Detection Systems business and consequently moved that business to discontinued operations in the quarter, [emphasis added].

Operating margins for the quarter expanded by 300 basis points to 16% as all business units achieved operating margin expansion of 170 basis points or more.

<u>"In the second quarter, we launched a record number of new products and announced several acquisitions and alliances which further improve the growth and value of our portfolio,"</u> noted Summe. [Emphasis added.]

10

23. With respect to the Optoelectronics division and Digital Imaging segment in particular, the July 15, 2001 press release disclosed:

> Optoelectronics sales were $108 million, for the quarter, down 6% organically. <u>Double-digit growth in Telecom and Digital Imaging was offset by severe declines in sales to the Photography and Semiconductor markets</u>. Operating margins grew 310 basis points as aggressive cost actions more than offset revenue softness. [Emphasis added.]

24. Defendants expanded upon the July 15, 2001 earnings release in a conference call for analysts and shareholders held on July 16, 2001. The conference call transcript was reported in an SEC filing dated July 17, 2001. Therein, Summe disclosed:

> V <u>In spite of difficult economic conditions, PerkinElmer delivered a very strong earnings growth in the second quarter. Specifically, our cash EPS was 38 cents a share, which beats the consensus street estimate and represent a 31-percent increase over the EPS for the second quarter of 2000. This marks our 15th consecutive quarter of delivering double-digit earnings growth and meeting or beating expectations</u>, [emphasis added].
>
> Operating margins for the quarter are expanded by 300 basis points, to 16 percent, driven by the success products and a continued focus on our productivity and quality. All of our businesses expanded operating margins by 170 basis points or more. Revenue for the quarter grew six percent to $391 million. Strong sales in Life Sciences, which (added) organic growth to 12 percent, Digital Imaging, Aerospace and Analytical Instruments were partially offset by sharp

11

declines in the semiconductor and the photography markets.

  25. In the same conference call on July 16, 2001, Friel stated as follows:

> V <u>Overall, we are very pleased with our results for the second quarter. In the midst of a very difficult business environment, we have once again exceeded our earnings commitment making this the 15th consecutive quarter we have achieved double-digit earnings per share growth. Our ability to achieve these results is due to improving portfolio businesses, our relentless focus on improving our operations and an aggressive approach to quality control</u>, [emphasis added].
>
> Operating margins in the quarter stand at 300 basis points as our gross margins expanded by 400 basis points, due to volume leverage in our Life Sciences and Instrument businesses and significant cost factors in our Optoelectronics and Fluid Sciences businesses. All the (SCUs) increased operating margins by at least 170 basis points.
>
>   \* \* \*
>
> V <u>Turning to Optoelectronics, revenue was 108 million, with 20 percent-plus growth in telecom and digital imaging</u> offset by softness in photography and semiconductor markets, yielding an overall organic decline of six percent. [Emphasis added.]
>
> Operating margins expanded 310 basis points as the revenue contractions occurred in our lower margin businesses and the impact of aggressive cost and productivity actions, which have been implemented during the previous three quarters, more than offset the revenue.
>
>   \* \* \*

> V    The Digital Imaging business continues to perform well with revenues up over 20 percent in the quarter. We recently produced our 100th (raz) panel and shipped our first cardiac panel to (GE Med Systems), [emphasis added].

26. As a result of defendants' positive statements concerning results in the second quarter of FY 2001, which spurred a series of positive securities analyst reports, the price of Perkin shares rose 23% from its trading price on July 16, 2001, to $34.48 by July 27, 2001.

27. Consonant with their previous highly positive announcements, on August 1, 2001, defendants caused the Company to make the following announcement concerning its "revolutionary" X-Ray panels produced by the Digital Imaging segment of the Optoelectronics unit:

> PerkinElmer Launches Volume Production of Digital Cardiac Flat Panel X-Ray Detectors for GE Medical Systems, First Deliveries in Q2 2001

> V    PerkinElmer, Inc. (NYSE: PKI) today announced another milestone in its alliance with General Electric Medical Systems (GEMS) in the initial production deliveries of what is expected to be the industry's first fully digital cardiac detector. The new system has the potential to replace conventional cardiac x-ray systems, based on image intensifiers, with high-resolution, with digital systems based on amorphous silicon, flat panel technology, [emphasis added].

> This revolutionary advance in the imaging of the human heart is the product of an ongoing cooperation between PerkinElmer and GEMS. "We are very excited to launch the cardiac detector," noted John J. Engel, President of PerkinElmer Optoelectronics. "This product is on the leading

13

> <u>edge for image resolution and quality, and follows on our successful radiography product which went into production early last year.</u> This is another product that will make a dramatic difference in peoples' lives." [emphasis added].

V   <u>PerkinElmer is the exclusive supplier of digital x-ray detectors to General Electric Medical Systems. The amorphous silicon cardiac detector is the engine behind the recently introduced GE InnQva(TM) 2000 product, which has been called "a quantum leap forward in cardiac x-ray image quality.</u>" [Emphasis added.]

28. Defendants' August 1, 2001 press release concerning the shipment of the X-Ray panels to GEMS and the characterization of the GEMS cardiac imaging product as a "quantum leap forward" in the field without any mention of the fact that GEMS and other customers had refused acceptance of the X-Ray panels roughly 40% of the time formed the basis for the Company's numerous statements throughout the remainder of FY 2001 concerning the potential growth of the Company. Indeed, this Court concluded in its September 30, 2003 Order: "PerkinElmer's repeated reference to the Optoelectronics unit and specifically to the x-ray panels in its press releases permits the inference that <u>PerkinElmer used the unit and the product to justify an optimistic forecast for the company's earning potential.</u>" [Emphasis added.]

29. On August 15, 2001, defendants caused the Company to file its second quarter Form 10-Q for FY 2001, ended July 1, 2001, which was signed by Friel. According to the Form

14

10-Q, "the information reflects all adjustments that, in the opinion of management, are necessary to present fairly the Company's results of operations, financial position and cash flows for the periods indicated." With respect to the Optoelectronics division in particular, the Form 10-Q disclosed:

> Revenues for the second quarter were $108.0 million versus $120.9 million for the prior period, resulting in a decrease of 11%. For the first six months, revenues were $228.9 million versus $235.4 million for the prior period, resulting in a decrease of 3%.

V    Higher revenues in telecom and digital imaging were offset by lower revenues in the photography and semiconductor markets which accounted for the decreases in both the quarter and the six month periods, [emphasis added].

> Operating profit for the second quarter was $16.2 million compared to $22.5 million for the prior period, decreasing 28%, and for the first six months was $34.7 million compared to $42.6 million for the prior period, decreasing 19%. The decline in operating profit for both periods is due to lower revenues, the cost of moving production facilities to lower cost locations and the beneficial impact of nonrecurring credits recorded in the prior year.
>
> Operating profit before net nonrecurring items and goodwill and intangibles amortization for the second quarter was $20.7 million versus $19.4 million for the prior period, increasing 7%, and for the first six months was $40.9 million versus $35.0 million for the prior period, increasing 17%. In the prior year, significant nonrecurring items for the second quarter included restructuring credits and for the six month period, certain nonrecurring pre-tax gains.

30. These statements regarding the Company's results for the second quarter of FY 2001 results were false and misleading. While touting the potential of the digital imaging X-Ray panel products, defendants failed to disclose that the production process for the X-Ray panels was flawed and that many of the X-Ray panels produced by the Company were defective, as detailed below. Defendants further failed to disclose that sales of the X-Ray panels were subject to a right of return, and that the right was frequently being invoked by the Company's main customers for these products. This failure to disclose was compounded by defendants' failure properly to account for such product returns by reporting the full value of these aborted sales as revenue, which practice caused the Company's financial results and net income growth to be overstated.

31. Contrary to the Company's announcements touting the performance of its Optoelectronics division and the Company's X-Ray panels, defendants were aware that these products were in fact seriously flawed and not commercially viable. While defendants' statements created the impression that the X-Ray panels were being accepted by the Company's major clients, defendants failed to disclose that approximately 40% of the X-Ray panels were in fact defective and were being returned to the Company by GEMS and other customers.

32. The X-Ray panels were fabricated in the Company's Santa Clara, California facility. Each panel took approximately 6 months to produce due to the 700 step process necessary to create the product in the facility's "clean" rooms. The panels were shipped to GEMS upon completion of this process, and the Company billed GEMS for each panel upon shipment and booked the revenue despite GEMS possessing an absolute right to return the product. This booking of such revenue upon shipment of a product with an absolute right of return was in violation of GAAP. Throughout the Relevant Period, GEMS regularly returned defective panels to the Company. Indeed, approximately 40 panels (at $100,000 per panel) were returned to the Company by the end of Fiscal Year ("FY") 2001. Notwithstanding these returns, defendants caused the Company to book the "sales" of the X-Ray panels as revenue, in violation of GAAP.

33. Defendant Summe was personally aware of the details of the Company's relationship with GEMS, because it was he who procured the GEMS contract through his prior employment as a general manager with General Electric ("GE") and resulting relationships with GE management. Summe maintained the GEMS account himself and personally handled Perkin's relationship with GEMS. He was therefore aware of: (1) the enormous failure rate of the panels; 2) GEMS' complaints about the performance of the panels, which included deterioration in the microlayers of

17

glass and chemicals that were part each panel; and (3) Perkin's practice of billing GEMS for the panels immediately upon shipment. Summe also knew that the Company improperly recognized revenue on these transactions in violation of GAAP.

34. On October 17, 2001, defendants issued a press release announcing results for the third quarter of FY 2001. Defendants caused the Company to announce yet another increase in quarterly earnings per share, along with more "double digit" earnings growth:

> BOSTON-(BUSINESS WIRE)--Oct. 17,2001--PerkinElmer, Inc. (NYSE:PKI) today reported that third quarter net income grew 16% to $40 million versus the same period in 2000. Net income from continuing operations was nearly $30 million, up 29% over the third quarter of last year. Third quarter earnings per share were $0.38 compared to $0.33 for the same period in 2000. EPS from continuing operations increased 27% year-over-year.
>
> "PerkinElmer has again delivered double-digit earnings growth -our 16th consecutive quarter - despite a slow economy," said Gregory L, Summe, Chairman and Chief Executive Officer. "The third quarter was also pivotal in the transformation of PerkinElmer. Consistent with the goal of shifting our portfolio to higher growth, we announced over $1 billion of acquisitions and divestitures. <u>We are now well positioned for growth in our three core businesses -Life Sciences, Optoelectronics and Instruments</u>." [Emphasis added.]

35. Concerning the Optoelectronics division and its digital imaging products, the October 17, 2001 press release disclosed:

18

> V    The company announced another milestone in its alliance with General Electric Medical Systems in the initial production deliveries of the industry's first fully digital cardiac detector. The new system has the potential to replace conventional cardiac x-ray systems, based on image intensifiers, with high-resolution, digital systems based on amorphous silicon, flat panel technology. PerkinElmer also entered into a strategic partnership with Elekta, a developer of cancer therapies, to supply its amorphous silicon panels for advanced imaging in cancer treatments. [Emphasis added.]
>
> Optoelectronics sales were $97 million for the quarter, down 16%. Double-digit growth in Digital Imaging was offset by continued declines in sales to the photograph}' and semiconductor end markets. Operating margins were 19% reflecting aggressive cost actions begun earlier in the year and continued benefits from low-cost manufacturing operations. [Emphasis added.]

36. On October 29, 2001, defendants caused the Company to file its Form 10-Q for the third quarter of FY 2001, ended September 30, 2001, which was signed by Friel. According to the Form 10-Q, "the information reflects all adjustments that, in the opinion of management, are necessary to present fairly the Company's results of operations, financial position and cash flows for the periods indicated." Concerning the Optoelectronics division, the Form 10-Q disclosed:

> Revenues for the third quarter were $97.2 million versus $126.3 million for the prior period, resulting in a decrease of 23%. For the first nine months, revenues were $326.1 million versus $361.7 million for the prior period, resulting in a decrease of 10%. On an organic basis, revenues for the third quarter decreased 16% versus that of the comparable period in prior year. The

19

decrease reflects industry-wide declines in the telecom, semiconductor and photography markets.

Operating profit for the third quarter was $14.2 million compared to $21.3 million for the prior period, decreasing 33%, and for the first nine months was $48.9 million compared to $64.0 million for the prior period, decreasing 24%. The decline in operating profit for both periods is due to lower revenues, the cost of moving production facilities to lower cost locations and costs associated with streamlining operations.

Operating profit before net nonrecurring items and goodwill and intangibles amortization for the third quarter was $18.2 million versus $23.3 million for the prior period, decreasing 22%, and for the first nine months was $59.1 million versus $58.3 million for the prior period, increasing 1%. Operating profit before nonrecurring items and goodwill and intangible amortization increased as a percentage of sales to 19% for the quarter and 18% for the nine-month period ended September 30, 2001 versus 18% and 16% for the respective periods in 2000.

37. The statements regarding the Company's results for the third quarter of FY 2001 results were false and misleading. While touting the potential of the Optoelectronics division in the October 17, 2001 press release, defendants again failed to disclose that the production process for the X-Ray panels was flawed, and that many of the X-Ray panels produced by the Company were defective. Defendants further failed to disclose that sales of the X-Ray panels were subject to a right of return, and that the right was frequently being invoked by the Company's main customers for these products. This failure to disclose was compounded by defendants' failure properly to