account for such product returns by reporting the full value of these aborted sales as revenue, which practice caused the Company's financial results and net income growth to be overstated.

38. In early December 2001, while the stock was trading at more than $30 per share, defendants Summe and Friel collectively sold 450,000 shares of Perkin stock for proceeds exceeding $13.9 million while in possession of the non-public, material information concerning the problems with the Company's X-Ray panels.

39. On January 24, 2002, defendants caused the Company to announce year end results for FY 2001, again boasting "strong consistent earnings growth" and "excellent progress":

> BOSTON-(BUSINESS WIRE)--Jan. 24,2002-- PerkinElmer, Inc. (NYSE:PKI) today announced that cash earnings per share for 2001 increased 18% to $1.09 compared to $0.92 for 2000. Net income from continuing operations grew to $117 million for the year.
>
> "<u>Our ability to deliver strong, consistent earnings growth, particularly in this difficult economic environment, is a testament to the effectiveness of our management and operational processes</u>," said Gregory L. Summe, chairman, and CEO of PerkinElmer. "<u>In addition, the company continued to make excellent progress on its strategy of moving the business mix toward higher growth</u>." [Emphasis added.]
>
> Operating profit in 2001 grew 16% to $192 million on revenue of $1.3 billion, which was flat on a year-over-year basis. Operating margins for the year expanded by 200 basis points to 14.4%.

21

>Commenting on the fourth quarter, Summe said, "The magnitude of change in our portfolio during this period was unprecedented. In November, we completed the acquisition of Packard BioScience, adding highly complementary strengths in automated liquid handling and sample preparation, as well as biochip technologies. The company also announced the sale of three non-strategic businesses for approximately $185 million in cash proceeds, which will fuel our future growth."
>
>For the fourth quarter of 2001, revenue was $361 million, down 4% versus the same period in the previous year. Operating margins in Q4 expanded 30 basis points to 14.8%.

40.     With respect to the Optoelectronics division in particular, the January 24, 2002 press release disclosed:

>In Optoelectronics, <u>strong double-digit growth in digital imagine and sensors</u> was offset by continued weakness in the photography and semiconductor markets, which drove revenue contraction of 22% organically to $90 million, negatively affecting operating margins, which decreased to 11%. Operating profit for 2001 was down 18% to $69 million on revenue of $416 million, which contracted 10% organically. Operating margins for the full year were 16.5% compared to 16.8% for 2000. During the year, the unit implemented aggressive cost and structural actions that position it for future growth in the high potential biomedical and telecommunications markets.

41.     On February 7, 2002, during its presentation at the 2002 Merrill Lynch Pharmaceutical, Biotechnology & Medical Device Conference, the Company confirmed 2002 earnings guidance of $ 1.24-$ 1.26 per share, a substantial increase over FY 2001 results of $1.09.

42. The optimistic statements regarding the Company's results for the fourth quarter and FY 2001 year end results, as well as its earnings guidance for FY 2002, were false and misleading. While touting "strong, consistent earnings growth" on the January 24, 2002 press release, defendants failed to disclose that the production process for the X-Ray panels was flawed, and that many of the X-Ray panels produced by the Company were defective. Defendants further failed to disclose that sales of the X-Ray panels were subject to a right of return, and that such right was frequently being invoked by the Company's main customers for these products. This failure to disclose was compounded by defendants' failure properly to account for such product returns by reporting the full value of these aborted sales as revenue, which practice caused the Company's financial results and net income growth to be overstated.

### THE "REORGANIZATION" OF OPTOELECTRONICS

43. On March 1, 2002, in a dramatic shift in tone from the highly positive statements issued in the months before, defendants caused the Company to issue a press release announcing that the Optoelectronics unit would suddenly be reorganized to "reduce costs," and that the Company's earnings per share for 2002 would be dramatically lower than forecast just weeks before. According to the press release, "clarity,

accountability and simplicity" would be brought to the Optoelectronics unit as a result of the reorganization:

> BOSTON, Mar 1, 2002 (BW HealthWire) -- PerkinElmer, Inc. (NYSE:PKJ) today announced that it has reorganized its Optoelectronics unit to reduce costs, and better position the business for growth in key markets. <u>The action will result in a restructuring charge against first quarter 2002 earnings.</u> [Emphasis added.]
>
> "We see long-term growth potential, for Optoelectronics' products and services in the biomedical and broadband communications segments," said Gregory L. Summe, chairman and chief executive officer of PerkinElmer. "<u>However, we have taken aggressive action in light of the effects of the recession on several of our served markets, notably telecommunications, semiconductors and photography. These actions will allow us to manage lower volumes in these soft markets in the short term, while positioning ourselves for market recovery.</u>" [Emphasis added.]

V   <u>PerkinElmer Optoelectronics has been restructured as a single business organized by function, bringing added clarity, accountability and simplicity to the unit.</u> [Emphasis added.]

V   <u>Due to the significantly reduced volume in Optoelectronics, coupled with lower than anticipated growth in Life Sciences and Analytical Instruments end markets, the company announced plans to take an additional restructuring charge of approximately $10-$15 million to further enhance its cost position and will reduce its workforce by approximately 500 employees from across the corporation.</u> [Emphasis added.]

]   <u>PerkinElmer projects cash EPS for the first quarter of 2002 of $0.16-$0.17. excluding the charges noted above. For the full year, cash EPS are estimated to be $1.03-$ 1.10.</u> [Emphasis added.]

44. In response to this announcement, the price of Perkin's shares plummeted 31% to $15.15 on 18 times normal trading volume, seriously damaging shareholder equity.

45. On March 28, 2002, defendants caused the Company to file its Form 10-K for FY 2001, which was signed by all of the Individual Defendants. In the Form 10-K, defendants represented that the financial results contained therein complied with GAAP. Defendants repeated substantially the same information announced in the January 24, 2002 press release regarding the Company's FY 2001 financial results. All of these financial results were false and misleading. The financial results and net income figures announced by defendants for FY 2001 were artificially inflated as a result of defendants' failure properly to account for the sale of the Optoelectronics unit's X-Ray panels during FY 2001, as alleged herein.

## "WEAKNESS" IN THE OPTOELECTRONICS UNIT

46. On April 11, 2002 defendants finally revealed the true nature and extent of the problems the Company was experiencing in the Optoelectronics unit, also disclosing an imminent "restructuring charge" that was eventually more fully disclosed as a $23.5 million restructuring charge to the Optoelectronics unit in an announcement defendants made on April 25, 2002:

> BOSTON, Apr 11, 2002 (BW Health Wire) -- PerkinElmer, Inc. (NYSE:PKI) today announced that it expects revenues for the first quarter which ended March 31, 2002 to be in the range of $300-$305 million or approximately 10% percent lower than anticipated, based on preliminary results. <u>The company attributed the shortfall primarily to weakness in its Optoelectronics end markets</u>, the deferral of capital spending by Analytical Instruments and Life Sciences customers, and sales force integration activities related to the merger with Packard BioSciences. <u>The company projects cash EPS for the first quarter of 2002 of approximately breakeven, as a result of an operating loss in the Optoelectronics business.</u> These results exclude any asset write-down or restructuring charges. [Emphasis added.]
>
> "The business environment has become very difficult. Customers in every sector are cautious about spending," said Gregory L. Summe, chairman and chief executive officer of PerkinElmer. "Despite the difficult environment, we continue to build the strength of our customer franchises. We believe that the capability of our organization, processes and technology leadership will allow us to successfully weather the current market turbulence." [Emphasis added.]

47. Defendants' reporting that first quarter FY 2002 earnings per share would be "breakeven" stood in stark contrast to their guidance just weeks before that earnings were projected to be up to $.17 per share. In response to this belated revelation of the truth, the price of Perkin stock declined to just $12 per share, on 66% lower than the high that exceeded $35 per share reached during the Relevant Period. Around the time of such peak in the Company's share price, defendants Summe and Friel sold 450,000 stock at prices of more

26

than $30 per share while in possession of non-public material information concerning the problems with the Company's X-Ray panels.

### THE $23.5 MILLION RESTRUCTURING CHARGE

48. On April 25, 2002, defendants caused the Company to announce that as a result of a restructuring charge, the Company would earn only one penny per share, and incur a huge "GAAP basis" loss of $.26 per share for the first quarter. Defendants announced as follows:

> BOSTON, Apr 25, 2002 (BW HealthWire) -- PerkinElmer, Inc. (NYSE:PKI) today announced first quarter 2002 cash earnings per share of $0.01 on revenue of $305 million from continuing operations. For the same period last year, cash earnings per share were $0.21 on revenue of $335 million. The company also announced that it was increasing its focus on the health sciences market by placing its telecom component and entertainment lighting businesses under strategic review. <u>Additionally, during the quarter, it took charges of $10.7 million for restructuring actions to further improve its cost position, and $23.5 million for inventory in the Optoelectronics business unit. With these charges, the company reported a GAAP basis loss of $0.26 per share from continuing operations.</u> [emphasis added].

49. The $23.5 million restructuring charge was further described in the Company's Report on SEC Form 10-Q for the first quarter of FY 2002, filed on May 15, 2002:

> Revenues for the first quarter of 2002 were $72.8 million versus $120.9 million for the first quarter of 2001, resulting in a decrease of 40%. The decrease reflects the disposals of the

27

> Voltarc business and certain product lines subsequent to the first quarter of 2001. In addition, industry-wide declines in sales to the telecom, semiconductor and selective lighting markets more than offset sales growth in the Company's sensors products. On an organic basis, revenues for the first quarter of 2002 decreased 24% versus that of the comparable period in prior year.
>
> V   <u>The reported operating loss for the first quarter was $34.1 million compared to a profit of $18.5 million for the first quarter of 2002, decreasing $52.6 million. The decrease in operating profit reflects the $23.5 million inventory adjustment taken as a result of significantly lower volumes experienced in several key markets, as well as the lower revenues and associated lower utilization of production capacity.</u>   [emphasis added].
>
> The adjusted operating loss before the $23.5 million inventory write-down, net nonrecurring items and goodwill and intangibles amortization for the first quarter of 2002 was $5.0 million versus an adjusted operating profit of $20.2 million for the first quarter of 2001.

50.  The $23.5 million restructuring charge for an "inventory adjustment" in the Optoelectronics segment was required due to defendants' improper accounting practices throughout the Relevant Period, as described herein. For the second, third and fourth quarters of FY 2001, the Company had touted "double digit" growth in its Digital Imaging segment. The Company only achieved this result by failing to follow GAAP by recognizing revenues on sales of defective X-Ray panels that were subject to a right of return, failing to adequately reserve

28

for returns, and failing to properly write down the value of returned X-Ray panels in a timely manner.

### DEFENDANTS' DISCLOSURES VIOLATED GAAP

51. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure of information that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

52. Defendants accounting for the sales of X-Ray panels violated GAAP as follows:

(a) Defendants violated Statement No. 5 of the Financial Accounting Standards Board ("FASB"), Accounting for Contingencies, which provides that an "estimated loss from a loss contingency shall be accrued by a charge to income" where it is "probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and the loss can be reasonably estimated." Such loss contingencies

29

include "obligations related to product warranties and product defects." Accordingly, pursuant to GAAP, Perkin was required to accrue a reasonable estimate of the costs involved in honoring warranty obligations to customers at the time the X-Ray panels were sold, which it failed to do. Furthermore, because the sales were subject to an absolute right of return, they were contingent sales. According to FASB No. 5, "<u>contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization</u>." [Emphasis added.] Defendants violated this principle by recognizing revenue upon shipment of the X-Ray panels.

    (b) Defendants also violated FASB No. 48, which provides that revenue can be recognized at the time of sale "only if the amount of future returns can be reasonably estimated. According to FASB No. 48, recognition of revenue must be "postponed" until the return privilege has substantially expired where, at the time of sale, the amount of future returns cannot be reasonably estimated. "Absence of historical experience" with a product "may impair the ability to make a reasonable estimate." Defendants had no "historical experience" with the "revolutionary" X-Ray panels prior to FY 2001. Recognition of revenue on the transactions was therefore improper, particularly in light of what defendants knew about

the product's poor quality and performance. Furthermore, under FASB No. 48, revenue "shall be reduced to reflect estimated returns." Defendants knew that product returns were actually occurring, yet failed to properly account for these returns.

(c) Defendants caused the Company to fail properly to account for inventories. GAAP requires that inventory is required to be recorded at the lower of cost or market value, with losses in worth recognized in the financial statements. During the Relevant Period, the Company's financial statements failed to reflect the write-down of inventory and associated losses in the Optoelectronics unit caused by the return of defective products, which according to the Company's subsequent disclosures in April 2002, totaled at least $23.5 million.

53. Defendants represented that the financial results they reported for the Company during the Relevant Period were prepared in accordance with GAAP. Defendants also represented that the reported results reflected all adjustments, consisting of normal recurring accruals, necessary for a fair presentation thereof. As specified above, however, defendants' representations concerning the Company's financial results during the Relevant Period were false and misleading in numerous material respects:

31

(a) Defendants falsely stated that the Company's financial statements fairly presented the Company's financial condition;

(b) Defendants failed to disclose that the Company's internal controls were grossly inadequate and, as a result, that the Company's ability to report financial data in its financial statements was seriously deficient;

(c) Defendants violated the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, §34);

(d) Defendants violated the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, §40);

(e) Defendants violated the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. That principle is particularly significant in the context of publicly-traded

32

entities such as Perkin. The officers of such companies voluntarily accept wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, §50);

(f) Defendants violated the principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to inform their decisions concerning the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least in part, upon evaluations of past enterprise performance (FASB Statement of Concepts No. 1, §42);

(g) Defendants violated the principle that financial reporting should be reliable and represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting (FASB Statement of Concepts No. 2, §§58-59);

(h) Defendants violated the principle of completeness, which requires that nothing is left out of a company's financial statements that may be necessary to ensure that they validly represent underlying events and conditions (FASB Statement of Concepts, No. 2, §79); and

(i) Defendants violated the principle that conservatism must be used as a prudent reaction to uncertainty to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, §§95, 97).

54. Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

### THE DIRECTOR DEFENDANTS' RESPONSIBILITY FOR INTERNAL ACCOUNTING CONTROLS AND FOR FINANCIAL REPORTING

55. Defendant Summe, as the Company's CEO and President, and the other Director Defendants, each of whom served as members of the Audit Committee during the Relevant Period, had the responsibility to ensure that Perkin had sufficient accounting controls to insure the accuracy of its reported financial results, including revenue recognition.

56. Furthermore, as members of the Audit Committee, defendants Lopardo, Schmergel, Erickson and Sicchitano were charged, according to Appendix D to Statement on

Auditing Standards No. 55, <u>Consideration of the Internal Control Structure in a Financial Statement Audit</u> ("SAS 55"), with objectives such as (i) making certain that "[transactions are recorded as necessary. . . to permit preparation of financial statements in conformity with generally accepted accounting principles. . . and to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

      57. As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records and control procedures that an entity should establish should be considered within the context of such criteria as: (i) an entity's size; (ii) its organization and ownership characteristics; (iii) the nature of its business, (iv) the diversity and complexity of its operations; (v) the entity's method of processing data, and (vi) its applicable legal and regulatory requirements. The larger the entity, the more complex, diverse and sophisticated the entity's business becomes, and the greater is the importance of accounting systems and controls. Moreover, public ownership of such an entity customarily requires a sophisticated internal control structure to ensure that transactions are accurately

recorded and that, prior to the public disclosure of any financial information, such transactions are compared to the existing assets to eliminate any discrepancies between the recorded and actual amounts.

58. According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing <u>supervision by management</u> to determine that it is operating as intended and that it is modified as appropriate for changes in conditions. [Emphasis added.]

59. When management permits a condition to exist in the company's internal control structure such that:

> the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements. . . may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions,

such condition is defined by Statement on Auditing Standards No. 60, <u>Communications of Internal Control Structure Related Matters Noted in an Audit</u> ("SAS 60")., as a "material weakness" in the company's internal control structure.

60. Due to the Director Defendants' total neglect of their duties as members of the Board and/or the Audit Committee, they permitted material weaknesses in the Company's

36

internal control structure such that the Company improperly recognized revenue.

**DEFENDANTS PROFITED FROM THE MISSTATEMENTS**

61. As a result of defendants' false and misleading statements, Perkin's stock traded at artificially inflated levels through the Relevant Period. The Insider Trading Defendants knew that revenues were being inflated through improper accounting.

62. Notwithstanding their access to this information as a result of their status as directors and/or officers of the Company and their corresponding duty either to refrain from trading or to disclose the adverse material facts set forth herein, the Insider Trading Defendants sold Perkin stock at artificially inflated prices while in possession of material, nonpublic information. These trades were not made as part of an ongoing trading pattern or strategy. Instead, they were unusual in timing and amount, and were made in order to profit from Perkin's inflated stock price. Indeed, defendant Summe's trade was his first since early 2000, and defendant Friel's trade was his first sale of Perkin stock. The insider trading during the Relevant Period is summarized below:

| Name | Date | No. Stock Sold | Avg. Price | Approx. Proceeds |
|---|---|---|---|---|
| G. Summe | 12/5/2001 | 300,000 | $30.04 | $9,012,000 |
| R. Friel | 12/6/2001 | 150,000 | $33.10 | $4,965,000 |

| Totals | | 450,000 | | $13,977,000 |
|---|---|---|---|---|

63. Summe also profited by virtue of the Company's incentive based compensation system. According to the Company's 2002 proxy statement:

> The Company's Performance Incentive Plan (PIP) provides incentive compensation to certain key employees. Mr. Summe and the other executive officers named in the Summary Compensation Table are participants in the PIP. Although the PIP is the primary source of cash incentives for officers, the Committee may award additional incentives to selected officers outside of the PIP in circumstances in which the Committee determines that an additional incentive established on a different basis is appropriate.
>
> In 2001, the PIP measured Mr. Summe and other senior staff officers (i.e., Finance, Human Resources and Legal) on the basis of growth in earnings per share (EPS) and cash measures. The bonus program for officers and other key employees in the strategic business units (SBU's) were measured on SBU net operating profit after tax (NOPAT), cash measures, and achievement of goals related to integrating acquisitions and facilitating divestitures. Each participant was assigned a target incentive, expressed as a percentage of base salary ranging between 10% and 100%. The target percentage represents the amount of the incentive award if performance targets are met. The targets are generally based on the performance of the participant's SBU or strategic business enterprise (SBE), Performance targets for certain officers and other corporate participants are based on consolidated performance. For SBU/SBE managers and participants, performance targets are based on SBU/SBE consolidated performance. The actual incentive award is determined by multiplying the target incentive by a formula performance factor based upon actual performance compared to the target performance.

38

> In 2001, Mr. Summe's target bonus was 100% of base salary. His target PIP was based on consolidated performance. <u>For 2001, the actual EPS and cash measures exceeded targets. As a result he received a PIP award of $1,360,000, which represents 160% of his target incentive. In addition, the Board awarded Mr. Summe an additional bonus of $815,000 under the CEO Incentive Plan based on the CEO evaluation by the Compensation Committee of his accomplishments against additional performance measures under three categories: strategic — 40%; operational — 30%; and organizational — 30%.</u>
>
> In February 2000, the Company provided Mr. Summe with a full recourse interest free loan of $875,000, <u>which included a forgiveness feature whereby the loan would be forgiven based on Mr. Summe meeting or exceeding significant performance goals. The loan was forgiven on December 31, 2001 based upon the Company having exceeded the performance goal of 50% growth in EPS over 1999 in two years or less (adjusted for the impact of acquisitions and divestitures').</u>
> [Emphasis added.]

64. Thus, for FY 2001, Summe received $4.8 million in compensation, in part by virtue of the unlawful conduct alleged herein.

### DERIVATIVE ACTION ALLEGATIONS

65. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23.1 on behalf of Perkin to enforce the claims of Perkin against the Individual Defendants, which may properly be asserted by Perkin and which Perkin has failed to enforce.

39

66. The wrongs complained of herein occurred during the Relevant Period, during which time plaintiffs were Perkin shareholders. Plaintiffs continue to hold stock in Perkin. Hence, plaintiffs have standing to bring this derivative action on behalf of Perkin to recover damages for all of the conduct described in this complaint.

67. Plaintiffs will fairly and adequately protect the interests of Perkin and its shareholders in enforcing the rights of Perkin against the Individual Defendants. Plaintiffs' attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of Perkin to insure the rights of the Perkin. Plaintiffs have no interests adverse to Perkin.

### THE INDIVIDUAL DEFENDANTS HAVE DAMAGED PERKIN

68. By reason of their positions as fiduciaries of Perkin and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed to Perkin fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.